Filed 9/26/22  P. v. Vallejo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C091994 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF191058) |
| v. | |
| DANIEL JAIME VALLEJO, | |
| Defendant and Appellant. | |

This case arises out of an altercation that occurred after a vehicle was towed from a parking lot in Woodland and recovered from the tow yard.  A jury found defendant Daniel Jaime Vallejo guilty of making a criminal threat to the owners (husband and wife) of the tow company (Pen. Code, § 422),[1] and driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)).  The jury also found that defendant refused to take a chemical

---

[1] Undesignated statutory references are to the Penal Code.

1

test to determine his blood-alcohol content. (Veh. Code, § 23578.) The jury failed to reach a unanimous verdict on the gang enhancements (former § 186.22, subd. (b)(1)), and the trial court declared a mistrial as to those enhancements.

In a bifurcated proceeding, the trial court found defendant had a prior conviction for driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)), and a prior serious felony conviction that qualified as a strike under the three strikes law (§ 667, subds. (a)(1), (c), (d) & (e)(1)). The court sentenced him to an aggregate term of seven years four months in prison and imposed a consecutive sentence of one year four months for his violation of his probation in another case, resulting in a total term of eight years eight months in prison.

Defendant timely appealed contending his criminal threat convictions must be reversed due to insufficient evidence, instructional error, evidentiary error, and ineffective assistance of counsel. After multiple delays for preparation of the record and continuances in the initial briefing schedule, the parties were permitted to file supplemental briefs addressing the impact of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill No. 333), the STEP Forward Act of 2021, which was enacted while this appeal was pending. (Stats. 2021, ch. 699, §§ 1-5.) The case was fully briefed on March 21, 2022, and assigned to the panel as presently constituted on May 5, 2022. The parties waived argument and the case was deemed submitted on August 30, 2022. We shall affirm the judgment.

## FACTUAL BACKGROUND

In February 2019, Ernest Thompson and his wife, Windy Miller-Thompson, owned a tow company in Woodland.[2]

---

[2] Given the similarity of their surnames, we refer to Ernest and Windy by their first names to avoid any confusion.

2

On the evening of February 25, 2019, a tenant who lived above the Burger Saloon in Woodland called the tow company after noticing that a sport utility vehicle (SUV) was parked in his parking space behind the restaurant. Ernest towed the SUV, which belonged to defendant, to the tow yard sometime after 8:30 p.m. and then went home.

Later that evening, defendant called the tow company and asked if he could pick up his SUV, explaining that his puppy was inside of it. Ernest agreed to meet defendant at the tow yard, which was located in a rural area "just outside" of downtown Woodland. Defendant, who had been drinking beer since the early afternoon, took an Uber to the tow yard.

Defendant was at the tow yard when Ernest and Windy arrived around 10:30 p.m. After Ernest refused defendant's request to "work out a deal," defendant paid Ernest the amount owed and signed some paperwork on the back seat of Ernest's truck because it was starting to rain. As defendant was doing so, he greeted Windy, who was sitting in the front passenger seat. Thereafter, Ernest opened the gate to the tow yard and directed defendant to his SUV.

When Ernest asked defendant whether his puppy was okay, defendant said, "Kiss my ass, motherfucker. Don't fucking talk to me." Because defendant was "rummaging through" his SUV and "taking a while," Ernest told him to "hurry up." In response, defendant said, "Fuck you, don't tell me shit." At this point, it was clear to Ernest that defendant was mad at him or the "situation."

As defendant was leaving the tow yard, he stopped at the gate where Ernest was standing. When Ernest said, "Have a good night," defendant began yelling at him in an angry and "cocky" manner. He said, "Mother fucker, do you know who I am[?]" When Ernest indicated that he did not know or care, defendant responded, "I'm a Norteño, motherfucker. Do you know who we are?" Defendant continued, "We are Norteños, motherfucker. We run this town." At that point, defendant got out of his SUV, took a picture of Ernest's license plate, and said, "I got your license plate, motherfucker. Now I

3

can find you. Put you on blast." When Ernest indicated that he did not know what "put you on blast" meant and asked defendant to leave, defendant said, "I told you, motherfucker. We run this town. Put you on blast. We are coming for you. I got your license plate. I will find you. I will find you and your family. You are fucking dead. I will kill you, your wife, your kids." Defendant drove away after Ernest told him to "get the fuck out of here."

At this point, Ernest, who was aware that the Norteños are a gang, was angry and concerned for Windy's safety. While Ernest was used to people being upset at him due to the nature of his job, he testified that he had been threatened by purported Norteños three or four times in the past, had some unspecified experience in the military, and had never received a death threat from a gang member and was concerned for his family's safety. Although Windy did not hear what defendant said to Ernest other than the "F word," she knew defendant was angry based on his body language and the tone of his voice. She also saw defendant "tak[e] down [her] vehicle information."

After Ernest closed and locked the gate, he got into the driver's seat of his truck. When Windy asked why he was so mad, Ernest explained that defendant had threatened her and their children and said he was going to find them, although Ernest indicated that the threats were "[p]robably all BS." Windy did not agree that the threats were "BS" and told Ernest that they should be concerned. A minute or so later, Ernest became concerned and worried and began to think the threat was "real" when he noticed that defendant's SUV was stopped on the side of the road. Ernest became more concerned when defendant followed him and tailgated his truck in a dangerous and threatening manner. Defendant swerved and sped up behind Ernest's truck, "like he [was] going to ram [it]"; defendant "ran up on [Ernest's] bumper and backed off" approximately five to 10 times.

4

At this point, Windy was afraid and Ernest decided not to drive "straight home." He drove a short distance, which included several turns, and then stopped at an intersection with two turn lanes. Defendant continued to follow Ernest's truck. Windy, who was "freaked out," "truly scared," and in fear for her life, called 911.[3]

At the intersection, defendant stopped next to Ernest's window, which was partially open and began angrily yelling in the direction of Ernest and Windy through the open front passenger side window. Ernest heard him say, "You're on blast, motherfucker. You are dead, you just don't know it. What are you going to do, bitch?" Ernest also heard defendant threaten to kill him and his family. Defendant said, "You are dead, motherfucker, your family is dead," and, "We are coming for you." Windy heard defendant say: "Put you on blast. We are Norteños, bitch, and I am going to come for you and your family."

Ernest believed that these threats were directed at both him and Windy because they included threats to kill his family. At this point, Ernest was fearful for the safety of Windy and their children. Windy was also fearful for her safety and the safety of her family. She believed that defendant would follow them and kill them and their children or that someone else would carry out his threats for him. Both Ernest and Windy were worried that defendant might have a weapon, and Ernest was afraid that defendant's SUV might hit his truck. Ernest was also afraid that defendant might have contacted a friend or other gang members to "escalate" the situation, and Ernest was concerned that

---

[3] During the 911 call, which was recorded and played for the jury multiple times, Windy said that defendant had threatened to kill her and her husband and was following them. Windy explained that defendant was a Norteño and currently threatening them, and indicated that her husband wanted to know where the nearest police officer was so he could drive to that location. Windy also said she believed defendant was intoxicated.

5

defendant would actually harm him. Windy believed that Ernest was scared at the intersection because he was quiet and did not try to stop her from calling 911.[4]

The 911 dispatcher advised Windy that there were no police officers in the area and instructed her to drive to the police station. As Ernest was doing so, defendant continued to follow Ernest's truck for about a minute or so until he "spun out" trying to make a turn.

At some point later that evening, Ernest and Windy spoke to a police officer over the phone. The officer believed that Ernest was "definitely" in fear and "disheveled from the incident" based on the panic in his voice and the manner in which he described the incident. Both Ernest and Windy told the officer that they were in fear and believed that defendant's threats would be carried out.

Around 11:00 p.m., defendant was pulled over by a police officer after he failed to stop at a stop sign. Defendant had red, watery eyes and smelled of alcohol. He refused to take a test to determine his blood-alcohol level and was arrested for driving under the influence. An involuntary blood draw administered at 1:07 a.m. revealed that defendant's blood-alcohol level was 0.14 percent.[5]

## DISCUSSION

### I

#### *Sufficiency of the Evidence*

Defendant contends that both of his criminal threat convictions must be reversed due to insufficient evidence. As we next explain, we disagree.

---

[4] On cross-examination, Windy recalled that Ernest had suggested she not call 911 at one point during the incident. On redirect examination, Windy clarified that this occurred at the tow yard before defendant began following and tailgating Ernest's truck.

[5] The reporter's transcript does not disclose defendant's blood-alcohol level. However, it is undisputed that his blood-alcohol level appeared in a document shown to the jury during the testimony of the criminalist who analyzed his blood sample.

6

A. *Standard of Review*

In a challenge to the sufficiency of the evidence supporting a conviction, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We must accept all logical inferences that the jury may have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

"The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) It is well-settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there

sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

B. *Section 422*

Section 422 requires proof of the following elements to establish a criminal threat: (1) the defendant willfully threatened to commit a crime that would result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement be taken as a threat, even if he had no intent to actually carry it out; (3) the threat was, on its face and under the circumstances in which it was made, so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety; and (5) the threatened person's fear was reasonable under the circumstances. (§ 422; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*); see CALCRIM No. 1300.)

For purposes of section 422, "immediate family" includes any spouse or child. (§ 422, subd. (b).)

C. *Analysis*

1. *Criminal Threat Against Ernest*

As for the criminal threat against Ernest, defendant only challenges the jury's findings as to the sustained fear element. He argues that there was insufficient evidence to support the jury's determination that Ernest was actually in sustained fear for his own safety or for the safety of his immediate family and that Ernest's fear was reasonable under the circumstances. We disagree.

"[P]roof of a mental element in the victim" is required to sustain a conviction under section 422. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) The prosecution must show that the threat actually caused the person threatened reasonably to be in sustained fear for his or her own safety or his or her immediate family's safety. (*Toledo,*

8

*supra*, 26 Cal.4th at p. 228; see also *Ayala v. Superior Court* (2021) 67 Cal.App.5th 296, 302-303.)  The sustained fear element has a subjective and an objective component.  "A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances."  (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140; see also *People v. Roles* (2020) 44 Cal.App.5th 935, 942.)

"Sustained fear" involves both the emotion the victim experienced and the time during which they experienced it.  (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349.)  To be sustained, the fear must last " 'a period of time that extends beyond what is momentary, fleeting, or transitory' " (*ibid*.; *People v. Wilson* (2015) 234 Cal.App.4th 193, 201), and ordinarily lasts "beyond the moments of the encounter" (*In re Ricky T.*, *supra*, 87 Cal.App.4th at p. 1140).  However, "a victim can experience sustained fear even if the fear exists only during the incident itself, as long as the fear during the incident is more than 'momentary, fleeting, or transitory.' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 634.)  Indeed, depending on the circumstances, even one minute can be enough time.  (*Fierro*, at p. 1349 ["When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory' "].)

A victim need not testify that they were in sustained fear in order to satisfy the subjective component of the sustained fear element.  Whether the victim was in sustained fear can be inferred from the evidence.  (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 417.)  Similarly, a percipient witness "could conceivably testify to having observed a person targeted by another's criminal threat actually experienced sustained fear and, in so doing, supply sufficient evidence of the subjective element."  (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 606.)

In determining whether the sustained fear element was satisfied, the threat must be examined both on its face and under the circumstances in which it was made.  (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 810.)

We conclude substantial evidence supports the jury's findings as to the sustained fear element. A reasonable jury could have concluded that defendant's threats and his threatening conduct actually caused Ernest to be in sustained fear for his safety and/or the safety of his immediate family, and that Ernest's fear was reasonable under the circumstances. Ernest testified that he was concerned for Windy's safety after defendant called him a "motherfucker" at the tow yard, claimed to be a member of a gang that ran the town, took a picture of his license plate, and then *threatened to find and kill him as well as his wife and children*. In making the death threat to Ernest, defendant indicated that his fellow gang members were "coming for [him]." Ernest further testified that he became more concerned and decided not to drive "straight home" after defendant followed and tailgated his truck in a dangerous and threatening manner. When Ernest stopped at an intersection shortly thereafter, defendant stopped next to his window and yelled additional threats, including again that he was going to kill Ernest, his wife, and their children. At that point, Ernest was worried that defendant had a weapon, afraid that defendant was following him because he had contacted a friend or other gang members to "escalate" the situation, fearful that defendant's SUV would hit his truck, and concerned that defendant would actually harm him. When asked, Ernest specifically testified that defendant's threatening statements made him fearful for the safety of Windy and their children. Further, Windy testified that she believed Ernest was scared at the intersection because he was quiet and did not attempt to stop her from calling 911. And a police officer who spoke with Ernest on the night of the altercation testified that Ernest was "definitely" in fear and "disheveled from the incident." The officer explained that there was panic in Ernest's voice, he spoke rapidly, and his initial accounts of the incident had to be repeated and/or clarified. During this conversation, Ernest said he believed defendant's threats would be carried out.

Under the circumstances presented, there is certainly substantial evidence supporting the sustained fear element. Although defendant initially notes that Ernest

10

never claimed that he was afraid and never used the word fear, such testimony is not necessary to satisfy the subjective component of the sustained fear element. (*People v. Ortiz, supra,* 101 Cal.App.4th at p. 417.) Moreover, as defendant acknowledges, Ernest specifically testified that he was fearful for the safety of his wife and children. Defendant also highlights evidence that, in his view, cuts against a finding that the threats caused Ernest to actually be in sustained fear, including Ernest's testimony that he was irritated, angry, nervous, anxious, worried, and concerned at certain points during the incident. In making this argument, however, defendant misapprehends the standard of review. Under the substantial evidence test, we view the evidence in the light most favorable to the jury's verdict and reverse only if it appears that upon no hypothesis whatever is there substantial evidence to support the jury's verdict. That is not the case here. As we have discussed, the record discloses that a reasonable trier of fact could have found the sustained fear element beyond a reasonable doubt based on the evidence presented at trial and the reasonable inferences drawn therefrom. Thus, defendant's sufficiency of the evidence claim fails.

### 2. *Criminal Threat Against Windy*

As for the criminal threat against Windy, defendant challenges only the jury's findings as to the intent and sustained fear elements. He argues that there was insufficient evidence to support the jury's determination that Windy was the intended recipient of the threats or that he intended Ernest to convey the threats to her. He also argues that there was insufficient evidence to support the jury's determination that Windy was actually in sustained fear for her own safety or for the safety of her immediate family, and that her fear was reasonable under the circumstances.

### a. *Specific Intent Element*

When a threat is spoken to a single victim, but the threat is against additional victims who hear the threat, the defendant may be convicted of separate counts for each

11

victim. (See *People v. Lipsett* (2014) 223 Cal.App.4th 1060, 1062-1063, 1065 (*Lipsett*); *People v. Solis* (2001) 90 Cal.App.4th 1002, 1008-1009, 1023-1025.)

"By its plain language, section 422 contains no exception for threats that are technically addressed to third parties. Instead, it requires that a defendant intend 'the statement . . . to be taken as a threat' by the victim. [Citation.] A defendant may harbor such intent even while grammatically addressing the threat to someone other than the victim." (*Lipsett*, *supra*, 223 Cal.App.4th at p. 1065.) The question is whether the defendant intended the victim identified in the charging document to take the statement as a threat, not whether the threat was syntactically addressed to that victim. (*Ibid*.)

We conclude substantial evidence supports the jury's finding that defendant intended Windy to take his statements at the intersection as a threat. The record reflects that defendant was aware Windy was sitting in the front passenger seat of Ernest's truck before he took a picture of Ernest's license plate at the tow yard and told Ernest that he was going to find and kill Ernest, his wife, and their children. He had signed paperwork on the back seat of Ernest's truck and had greeted Windy in the front seat while doing so. Shortly thereafter, he followed and menaced Ernest's truck in his SUV, and then yelled threats to harm both Ernest and Windy through an open window while next to them at an intersection. He identified himself as a Norteño and indicated that he and his fellow gang members were going to harm Ernest and his family. Defendant was looking at both Windy and Ernest while he was yelling, and Windy heard defendant's threats to harm her and her family. Based on this evidence, a reasonable jury could have concluded that defendant intended Windy to take his statements as a threat to her safety and/or the safety of her immediate family. (See *People v. Fierro, supra,* 180 Cal.App.4th at p. 1348 ["There is no reason for appellant to do what he did and say what he said if he had not had the specific intent that the [victims] interpret his actions as a threat"].)

Contrary to defendant's contention, reversal is not required because he never "personally" addressed Windy. Even if defendant had only been directly speaking to

Ernest at the intersection, a reasonable jury could have found that he intended to threaten her with the statements he made to Ernest while Ernest was seated next to her and defendant was referencing a "wife" and family." (See *Lipsett, supra*, 223 Cal.App.4th at p. 1065 [jury could have reasonably inferred that the defendant made a threat intending to scare the victim when he told a third party to shoot the victim while he was attempting to steal the victim's bike].)

b. *Sustained Fear Element*

We conclude there is ample evidence in the record to support the sustained fear element of the criminal threat offense. At trial, Windy explained that she became concerned at the tow yard when she heard defendant angrily yelling at Ernest and saw defendant "tak[e] down [her] vehicle information." Thereafter, Ernest told Windy that defendant had threatened her and their children and said that he was going to find them, which made her concerned. Windy called 911 because she was in fear for her life after defendant followed and tailgated Ernest's truck in a dangerous and threatening manner. Shortly thereafter, at an intersection, she heard defendant threaten to harm her and her family. Later that same evening, Windy told a police officer that she was in fear and that she believed defendant's threats would be carried out. Windy also testified that her fear for her own safety and that of her immediate family lasted well beyond the altercation with defendant.

Windy testified unequivocally that defendant's threats and threatening conduct made her fear for her own life and the lives of Ernest and their children. Defendant, for his part, concedes that Windy's testimony "could support a finding that she was actually afraid."

We are unpersuaded by defendant's contention that Windy's fear was not "sustained" within the meaning of section 422. The evidence in the record supports the conclusion that Windy remained in fear far beyond the moment when defendant made the

13

threats at the intersection.  None of the cases relied upon by defendant support a contrary conclusion.

II

*Alleged Instructional Error*

Defendant raises two claims of instructional error on appeal, which present questions of law we review de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Moore* (2018) 19 Cal.App.5th 889, 893; *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*).)  As we shall explain, we find no basis for reversal.

A.  *Unanimity Instruction*

Defendant contends the trial court committed prejudicial error by failing to give a unanimity instruction sua sponte, that is, to instruct the jury that it must unanimously agree on the specific threat(s) that provided the basis for the verdict on each of the criminal threat counts.  He argues that because there were two distinct sets of threats (the threats at the tow yard and the threats at the intersection), the jury could have disagreed as to which set of threats supported the verdict as to each alleged victim.  We are not persuaded.

1.  *Applicable Legal Principles*

A criminal defendant has a constitutional right to a unanimous jury verdict. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; *Ramos v. Louisiana* (2020) ___ U.S. ___.)  Each individual juror must be convinced, beyond a reasonable doubt, that the defendant committed the *specific* offense they are charged with.  (*Russo*, at p. 1132; *Hernandez, supra*, 217 Cal.App.4th at p. 569.)  The unanimity requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' "  (*Russo*, at p. 1132.)

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the

14

information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679; see also *People v. Russo, supra*, 25 Cal.4th at p. 1132 [if the prosecution does not elect to rely upon a single criminal act when the evidence suggests more than one discrete crime for a charged offense, then the trial court has a duty sua sponte to instruct the jury it must unanimously agree that the defendant committed the same specific act]; *People v. Norman* (2007) 157 Cal.App.4th 460, 464 ["cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act"].) The prosecution's election of the criminal act(s) relied upon to provide the basis for a charged crime may be accomplished in opening statement and/or closing argument. (*People v. Brown* (2017) 11 Cal.App.5th 332, 341; *People v. Mayer* (2003) 108 Cal.App.4th 403, 418.)

There are several exceptions to the general unanimity rule. "For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction.' " (*People v. Jennings, supra*, 50 Cal.4th at p. 679; see also *Hernandez, supra*, 217 Cal.App.4th at pp. 572-573 ["continuous course of conduct exists when the same actor performs the same type of conduct at the same place within a short period of time"].) There also is no need for a unanimity instruction if the defendant offers essentially the same defense to each of the criminal acts, and there is no reasonable basis for the jury to distinguish between them. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100; see also *Jennings*, at pp. 679-680.) "That is, the failure to instruct is not error 'unless there is evidence based on which reasonable jurors could disagree as to which act the defendant committed.' " (*People v. Percelle* (2005) 126 Cal.App.4th 164, 181-182.)

## 2. *Analysis*

As we have described, the acts giving rise to the criminal threat charges in this case were closely related in time and place. The confrontation at the tow yard led almost immediately to defendant's tailgating and threatening conduct toward his victims while driving, including pulling up next to their vehicle and continuing to verbally threaten them with harm at the intersection.

Defendant did not testify at trial, and the evidence was uncontradicted as to the threats he made and the threatening conduct that accompanied them. The uncontradicted evidence showed that Ernest heard both sets of threats, and Windy heard the threats made at the intersection. In closing argument, the prosecutor treated the altercation as a single incident during which defendant made multiple threats, and as a result of which Ernest and Windy suffered a single episode (respectively) of sustained fear. Defense counsel did not argue in a manner that distinguished between the two sets of threats and did not dispute that the threats were made. Instead, he characterized defendant's statements as "dumb stuff" he "shouldn't have [said]" and "empty threats" made by an angry "[d]runk guy talking crap." Defense counsel urged the jury to return not guilty verdicts on the criminal threat counts because the threats did not actually cause Ernest or Windy to be in sustained fear, defendant was too drunk to form the requisite specific intent to commit the offenses, and the threats were not so clear, immediate, unconditional, and specific as to convey an immediate prospect that they would be carried out.

On this record, we conclude that a unanimity instruction was not required because defendant's acts constituted a continuous course of criminal conduct. The acts were closely connected in time and place so as to form part of one transaction. (See *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1533 [the defendant's struggle with several officers within a short period of time constituted a continuous course of conduct not requiring unanimity instruction]; *People v. Jefferson* (1954) 123 Cal.App.2d 219, 221 [no unanimity instruction required where the defendant, using two different knives in two

16

different locations within a period of 10 to 15 minutes, slashed at police officers because the acts occurred during "continuous effort on the part of the officers to disarm" him].) Further, a unanimity instruction was not required because the prosecutor elected to rely upon all of the uncontradicted threats and threatening conduct as providing the basis for the criminal threat counts without singling out any specific threat or set of threats.[6] (See *Lopez*, at pp. 1533-1534 ["when a prosecutor elects to rely on multiple acts in a continuous course of conduct as one crime, no unanimity instruction is required"].)

We find defendant's reliance on *People v. Melhado* (1998) 60 Cal.App.4th 1529, misplaced. In that case, the defendant was charged with making terrorist threats to an auto repair shop owner. (*Id*. at pp. 1532-1533.) The defendant visited the shop at 9:00 a.m. and then again at 11:00 a.m., making threats each visit and carrying what appeared to be an operable grenade during the second visit. (*Id*. at p. 1533.) Outside the jury's presence, the prosecutor elected to rely on the 11:00 a.m. incident for the terrorist threats charge. (*Id*. at p. 1535.) During closing argument, however, the prosecutor discussed both incidents, emphasizing the 11:00 a.m. incident, but never explicitly informing the jury of his election. (*Id*. at p. 1536.) The trial court did not give a unanimity instruction. (*Id*. at p. 1532.) The appellate court reversed, concluding that the trial court should have instructed on unanimity because each incident was sufficient to establish criminal liability and the prosecutor failed to clearly communicate to the jury which incident it should consider as the basis for conviction. (*Id*. at pp. 1536-1539.) *Melhado* is distinguishable from the circumstances of this case.

---

[6] The prosecutor did not argue that defendant's threats at the tow yard were sufficient to establish criminal liability but instead acknowledged that Ernest called those threats "a bunch of BS," and argued that Ernest's demeanor changed and he became fearful after defendant followed his truck, he learned that there were no police officers in the area, and defendant made similar threats at the intersection.

17

B. *Lesser Included Offense Instruction*

Defendant contends the trial court committed prejudicial error by failing to instruct the jury on the lesser included offense of attempted criminal threat. We disagree.

1. *Applicable Legal Principles*

In every criminal case, the trial court must instruct the jury on the general principles of law relevant to the issues fairly raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) This duty includes instructing on lesser included offenses if evidence is presented that, " 'if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) " 'Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.] Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.' [Citations.] 'Substantial evidence,' in this context, 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) In deciding whether there is substantial evidence to support a lesser included offense instruction, a court determines only the bare legal sufficiency of the evidence, not its weight. (*Breverman,* at p. 177.) In doing so, courts "should not evaluate the credibility of witnesses," which is a task for the jury. (*Id.* at p. 162.)

We independently review the trial court's refusal to instruct on a lesser included offense, considering the evidence in the light most favorable to the defendant. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

Attempted criminal threat is a lesser included offense of making a criminal threat. (*Toledo, supra*, 26 Cal.4th at p. 230.) As our Supreme Court explained in *Toledo*, "a defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs

an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Id*. at pp. 230-231.)

A variety of circumstances fall within the reach of the offense of attempted criminal threat. (*Toledo, supra*, 26 Cal.4th at p. 231.) Such situations generally involve "a fortuity, not intended by the defendant, [that] has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Ibid*.) For example, "if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat." (*Ibid*.) Likewise, "if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur." (*Ibid*.) Further, "if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Ibid*.)

19

2. *Analysis*

Defendant has not cited substantial evidence in the record from which a reasonable jury could have concluded that he committed the lesser offense of attempted criminal threat but not the greater offense of making a criminal threat.

Although defendant concedes that Windy testified that she was afraid as a result of his threats and threatening conduct, he nonetheless posits that the jury may have harbored a reasonable doubt as to whether she was actually afraid due to her "steady demeanor" on the 911 call.[7] He also theorizes that the jury may have harbored a reasonable doubt as to whether her fear was sustained because defendant stopped following her and Ernest less than a minute after the threats at the intersection. We are unpersuaded that this constitutes substantial evidence supporting a lesser included offense instruction as to Windy. We are similarly unpersuaded by defendant's contention that the jury might have "entertained a reasonable doubt that Ernest was *actually* afraid in view of his testimony pointedly describing boredom, rage, anger and concern, but not fear." Having reviewed the record as a whole, we discern no substantial evidence that would have supported an instruction on the lesser included offense of attempted criminal threat.

We find defendant's reliance on *Toledo*, *supra*, 26 Cal.4th 221, misplaced. In that case, the defendant engaged in threatening behavior and threatened to kill his wife Joanne during an argument. (*Id.* at pp. 224-225.) Later that evening, Joanne told an investigating officer that she was afraid that defendant was going to kill her. (*Id.* at p. 225.) However, when Joanne testified at trial, she "denied that she had entertained any

---

[7] At trial, Windy agreed that her voice was "pretty steady" during the 911 call and that she was not screaming or crying and did not sound "particularly upset." However, when asked about the emotions she was feeling at the time she made the call, she stated that she was in fear for her life. She explained that she appeared to be calm because she "wanted to get [her] information to the dispatcher as clearly and correctly and effectively as possible," which would not have occurred if she was "erratic" and screaming.

fear of defendant on the evening in question," and there was evidence that she attempted to return to her apartment on that evening. (*Ibid*.) In concluding that the defendant was properly convicted of the crime of attempted criminal threat, our Supreme Court reasoned: "[T]he jury in this case properly could have found that defendant's threat to Joanne . . . was made with the requisite intent and was the type of threat that satisfied the provisions of section 422 and reasonably could have caused Joanne to be in sustained fear for her own safety. At the same time, however, the jury might have entertained a reasonable doubt—in view of Joanne's testimony at trial that she was not frightened by defendant's statements, and the circumstance that Joanne apparently had been willing to return to her apartment with [a neighbor] on the night in question—as to whether the threat *actually* caused Joanne to be in such fear. Thus, the jury evidently found defendant guilty only of attempted criminal threat rather than the completed crime of criminal threat, not because defendant's conduct fell short of that required by the criminal threat provision, but simply because defendant's threat happened not to have as frightening an impact upon Joanne as defendant in fact had intended." (*Id*. at p. 235.)

Here, unlike *Toledo*, neither victim affirmatively denied experiencing any fear as a result of defendant's threats and threatening conduct. To the contrary, both consistently testified they were afraid for the safety of their immediate family. Windy also testified that she was in fear for her own safety, and Ernest testified that he thought defendant would actually harm him. Further, on the night of the threats, both Ernest and Windy told a police officer that they were in fear and believed that defendant would (himself or with others' help) carry out his threats. Windy added that she believed Ernest was scared at the intersection based on his behavior and that her fear for her own safety, as well as that of her immediate family, lasted well beyond the altercation with defendant.

21

III

*Alleged Evidentiary Error*

Defendant contends the trial court committed prejudicial error by admitting irrelevant and prejudicial gang evidence. In his opening brief, defendant challenges only the admission of the evidence concerning three uncharged incidents: (1) the incident giving rise to his 2016 convictions for accessory to murder (§§ 32/187) and participation in criminal street gang activity (§ 186.22, subd. (a)); (2) a 2001 incident involving a fistfight and theft, and (3) another 2001 incident involving a fistfight.

In each of the 2001 incidents, defendant made gang-related statements (e.g., "What did you say to me? Do you want some Norte, puto?") The 2016 incident involved the shooting of a Sureño associate and a Sureño gang member by a rival Vario Bosque Norteño gang member. Defendant was a passenger in the car from which the shots were fired.

Defendant argues that because the challenged gang evidence was highly prejudicial as to the criminal threat counts, the trial court erred when it failed to exclude it. He contends that the court should have excluded the evidence under Evidence Code section 352. As we next explain, we need not decide whether the trial court erred because we find no prejudice.

As set forth *ante*, the evidence supporting guilt on the criminal threat counts was strong. The uncontradicted evidence showed that defendant made the threats and engaged in the threatening conduct that we have described at length above.

In closing argument, defense counsel did not dispute that defendant made the threatening statements or engaged in the threatening conduct Windy and Ernest described at trial. Indeed, as we have detailed above, defense counsel conceded that defendant said some "dumb stuff" that he "shouldn't have" but characterized defendant's statements as "empty threats" made due to intoxication and anger. Counsel urged the jury to return not guilty verdicts on the criminal threat counts because the threats did not actually cause

22

Ernest or Windy to be in sustained fear, defendant was too drunk to form the requisite specific intent to commit the offenses, and the threats were not so clear, immediate, unconditional, and specific as to convey to Ernest and Windy an immediate prospect that they would be carried out.

The jury was given a limiting instruction regarding its consideration of the challenged gang evidence. Pursuant to a modified version of CALCRIM No. 375, the jury was instructed that the evidence concerning the uncharged incidents was only to be considered for the limited purpose of deciding whether defendant acted with the intent to assist, further, or promote criminal conduct by gang members in this case, whether defendant had a motive to commit the gang enhancements, or, whether defendant knew he was acting for the benefit of the Vario Bosque Norteños[8] when he allegedly acted in this case. The jury was specifically told that the challenged evidence could not be used as evidence that defendant had a bad character or was disposed to commit a crime. We presume that the jury followed these instructions, and we see nothing in the record to rebut that presumption. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 725.)[9]

---

[8] A prosecution expert on criminal street gangs testified that the Vario Bosque Norteños are a subset of the larger Norteño gang. The expert also testified that defendant was an active member of the Vario Bosque Norteños in July 2016 and in February 2019 when the charged offenses were committed.

[9] As defendant correctly points out, when reading the limiting instruction to the jury, the court stated, in relevant part: "If you decide that the defendant committed the offenses [that were not charged in this case], you may, but are not required, to consider that evidence for the limited purpose of deciding whether the defendant acted with the intent to *assault*, further or promote criminal conduct by gang members in this case or the defendant had a motive to commit [the gang enhancements] alleged in this case or the defendant knew he was acting for the benefit o[f] the Vario Bosque Norteños when he allegedly acted in this case." The court erroneously said "assault" instead of "assist," but the written version of the instruction was correct. Further, both the oral and written versions of the jury instructions told the jurors: "Only consider the final version of the instructions in your deliberations." Defendant does not point to anything in the record to

23

The jury failed to reach a unanimous verdict on the gang enhancements (former § 186.22, subd. (b)(1)), and a mistrial was declared as to those enhancements. The record reflects that the jurors were evenly split, with six in favor and six against a true finding on the enhancements. Thus, at least half of the jurors did not accept the gang evidence and uncharged offense evidence uncritically. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 613.)

Under these circumstances, we are convinced that defendant suffered no prejudice from the asserted evidentiary error. We do not find it reasonably probable that defendant would have obtained a more favorable result had the challenged evidence been excluded. (*People v. Johnson* (2022) 12 Cal.5th 544, 611 [state law evidentiary error is reviewed for prejudice under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 standard].)[10]

## IV

### *Assembly Bill No. 333*

In supplemental briefing, defendant contends Assembly Bill No. 333 supports a finding that the admission of *all* the gang evidence prejudiced him as to the criminal threat counts. He adds that the new section 1109 added by Assembly Bill No. 333 requires that the judgment be reversed and the matter remanded for possible retrial on those counts without the gang evidence. We disagree.

---

rebut the presumption that the jury followed the written instructions that were provided. (*People v. Frederickson* (2020) 8 Cal.5th 963, 1026.) And we are unpersuaded by defendant's contention that the trial court's error in orally instructing the jury was "tantamount to inviting them to use [the uncharged offense evidence] as propensity evidence."

[10] In view of our conclusion that defendant suffered no prejudice as to the asserted evidentiary error, we reject his related contention that his trial counsel was ineffective for failing to object to the challenged evidence on other grounds.

24

Effective January 1, 2022, Assembly Bill No. 333 made significant modifications to the substantive and procedural requirements for establishing a gang enhancement under section 186.22. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 477-478; Stats. 2021 ch. 699, § 3.)[11] In addition to the substantive changes, Assembly Bill No. 333 added section 1109, which provides a new procedure for trying substantive offenses and gang enhancements under section 186.22. (*E.H.*, at p. 478; Stats. 2021 ch. 699, § 5.)

As relevant here, section 1109, subdivision (a) requires a gang enhancement charged under section 186.22, subdivision (b) or (d) to be tried separately from the substantive offense(s) upon request from the defense. (§ 1109, subd. (a).) In enacting Assembly Bill No. 333, the Legislature explicitly found that "[g]ang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people," "California courts have long recognized how prejudicial gang evidence is," "[s]tudies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions," and that "[b]ifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021 ch. 699, § 2.)

The parties dispute whether section 1109 applies retroactively and whether defendant's criminal threat convictions must be reversed, because the trial on the gang enhancement allegations was not bifurcated from the trial on the substantive charges.

The Courts of Appeal are split on whether section 1109 applies retroactively. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-568, review granted July 13, 2022, S274100, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1125-1131 with *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022,

---

[11] Because the jury did not find the gang enhancement allegations true, we need not discuss the changes to section 186.22 effectuated by Assembly Bill No. 333.

S275090, and *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341.) Most recently, in *People v. Tran* (2022 WL 3711711 at page *19, our Supreme Court expressly declined to resolve the split. However, we need not reach this issue because even if we assume section 1109 applies retroactively, defendant was not prejudiced by the failure to bifurcate.

As we have explained, the uncontradicted evidence against defendant as to the criminal threat counts was strong, the jury did not find the gang enhancements true, and the jury was specifically instructed that the evidence that defendant committed other uncharged offenses could not be used to conclude that he had a bad character or was disposed to commit a crime. Further, some gang evidence would have been relevant to, and admissible, regarding the criminal threat counts, including defendant's intent and motive. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [gang evidence can help prove motive, specific intent, and other issues pertinent to guilt of the charged crime]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related"].) Given the specifics of this record, we are convinced there is no reasonable probability that defendant would have obtained a more favorable result had the trial been bifurcated. (See *People v. Ramos, supra*, 77 Cal.App.5th at p. 1131 [applying *Watson* harmless error standard]; *People v. E.H., supra*, 75 Cal.App.5th at p. 480 [same].)

We are unpersuaded by defendant's contention that reversal is required because all of the gang evidence was so prejudicial it rendered his trial on the criminal threat counts fundamentally unfair. Defendant has failed to show that this is one of the rare and unusual cases where the admission of gang evidence violated federal due process and resulted in a fundamentally unfair trial. (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 217, 220-221, 227-228, 232 [defendant entitled to new trial due to the admission of

extremely inflammatory gang evidence that had no relevance to the underlying charges or legitimate purpose].)[12]  We see no grounds for reversal.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Hull, Acting P. J.

_____/s/_____
Hoch, J.

---

[12]  In light of our conclusion that the failure to bifurcate was harmless, we need not and do not reach the Attorney General's argument that defendant forfeited his bifurcation claim.